Carroll,
March 1, 1921.

### SAMUEL C. ADAMS *v.* SUSAN P. ADAMS & a.

Under G. L., c. 183, s. 1, a married woman may make a valid contract to sell her
land to her husband, may make conveyance thereof directly to him, or may
be estopped to set up technical defects in her title thereto as administratrix;
a husband may acquire title to his wife's land by prescription.

The grantor in a deed invalid because of non-delivery is not entitled to a decree
nullifying the subsequent deeds of his grantee, and the grantees therein may
enforce the covenants against their grantor and any title subsequently acquired
by him inures to them.

BILL IN EQUITY, for the cancellation of a certain instrument pur-
porting to be the deed of Francis P. Adams to the defendant Susan
P. Adams, dated August 26, 1909, and of certain deeds from Susan
P. Adams to the defendants Warren and Huckins, subsequent in date
to the deed from Francis P.   The prayer of the bill is that the said
deeds be declared null and void and expunged from the record.   Heard
by *Marble*, J., who reported the following facts:

The plaintiff is the son, and the defendant Susan P. Adams is the
widow, of Francis P. Adams who died June 18, 1914.   The defendants
Warren and Huckins are innocent purchasers for value from Susan
P. Adams.   The real estate in controversy is situate in Ossipee and
was owned by Adam Brown, the father of Susan, who after Adam's
death in her capacity as administratrix of said Adam and in her own
right, being the sole heir of Adam, conveyed the same for a valuable
consideration to her husband Francis by deed dated March 30, 1883.
The court found that the alleged deed from Francis P. Adams to
Susan P. Adams was never delivered and granted the prayer of the bill.

Near the close of the trial Mrs. Adams filed an additional plea put-
ting in issue the validity of her deed to her husband of March 30,
1883.   There is no record of any license for the sale of real estate by
Mrs. Adams as administratrix of her father.   The consideration of
the deed from Susan P. to Francis P. Adams was substantial as well
as valuable.   It was executed without the exercise of duress, coercion,

or undue influence by Francis P. Mrs. Adams and her husband lived together until his death, but he dealt with the land in controversy as his own and had visible, exclusive, and adverse possession of it under color of title from March 30, 1883, to June 18, 1914. Mrs. Adams besides releasing her dower in twelve deeds signed as a witness to a deed and to a lease of various parcels of the land executed by Francis P. These transactions took place in different years from 1887 to 1912 inclusive.

The court did not pass upon the validity of the deed of March 30, 1883, ruling it was unnecessary to do so because it was found that Mrs. Adams by her conduct waived her right to object to that conveyance and is now estopped to deny its validity and because it was also found that Francis P. Adams had acquired title by adverse possession.

The defendants excepted to the decree ordering the several deeds expunged from the record and particularly the deeds of the defendants, who purchased from Mrs. Adams, and to the rulings that Mrs. Adams waived her right to object to the deed of 1883 and is estopped to deny its validity; that Francis acquired title by adverse possession; and that it was unnecessary to pass upon the validity of Mrs. Adams' deed to her husband.

The defendants' bill presenting these exceptions was allowed at the May term, 1918, of the superior court by *Marble*, J.

*Snow, Snow & Cooper (Mr. Conrad E. Snow orally),* for the plaintiff.

*Hurlburt, Jones & Hall* (of Massachusetts), and *Drew, Shurtleff, Morris & Oakes (Mr. Morris orally),* for the defendants.

PARSONS, C. J. If Susan P. Adams had no title to the lands conveyed to Warren and to Huckins, the deeds conveyed nothing. But it does not follow that the deeds are void because for this reason these defendants failed to acquire title to the land. Unless some other reason appears for setting the deeds aside, they remain valid. Mrs. Adams is liable on the covenants and the deeds will convey any other title she has or may have to the land. No question has been raised as to the authority of the court to order the deeds "expunged from the records." The power to make such an order and the method of its practical execution not being questioned by the parties, are not considered.

If Mrs. Adams had at the date of her deeds to Warren and to Huckins title to the lands conveyed as heir of her father, her deeds

conveyed title to them. She attempted in 1883 to convey her title to this land to her husband. The court ruled that it was unnecessary to pass upon the validity of this deed because he found upon evidence, the sufficiency of which is not questioned, except for the legal effect of the marriage relation between the parties, that Mrs. Adams was estopped to question the validity of her deed and because Francis P. Adams had acquired title by adverse possession.

At common law the deed of a *feme covert* which was not also executed by her husband passed no interest and was a mere nullity. *Dickinson* v. *McLane,* 57 N. H. 31. By the same law, because in legal conception one person, husband and wife could not contract with each other. *Kimball* v. *Kimball,* 75 N. H. 291; *Patterson* v. *Patterson,* 45 N. H. 164. Incapacity to contract cannot be removed by estoppel. Nor is an attempt to act, a waiver of the disability. *State* v. *Hutchins,* 79 N. H. 132, 140; *Bank* v. *Sanborn,* 60 N. H. 558, 561; *Bank* v. *Buzzell,* 60 N. H. 189; *Parsons* v. *Rolfe,* 66 N. H. 620; *Bergeron* v. *Bank,* 63 N. H. 195. The deed executed by Mrs. Adams, in which the consideration is set out with great particularity, evidences a contract with her husband for the sale of her land to him; a contract relating to such estate. If she had power to make such a contract with her husband she might be estopped to set up technical defects in the deed or in the want of power in the representative grantor through want of a probate license to sell, or otherwise, and if while the statute ran she was not disabled from protecting her rights, she might permit an adverse possession to be gained by one who as against her had exclusive actual possession. The fundamental question in the case therefore is, whether in 1883 her common-law incapacity had so far been removed by statute that a married woman could make a valid contract to sell her land to her husband. This estate was inherited by Mrs. Adams from her father. By the statute in force in 1883, G. L., c. 183, s. 1; Laws 1860, c. 2342; Laws 1865, c. 4080, every married woman was entitled to hold property so obtained "to her own use, free from the interference or control of any husband." As to property so held, she had the same rights and was subject to the same liabilities as if unmarried. G. L., c. 183, s. 12; Laws 1846, c. 327, s. 4. Although the precise question of the power of a married woman to contract a sale of her land to her husband does not appear to have been raised, it has been held in numerous decisions that the legislation gave to a married woman power to make any contract in reference to her separate estate with any person, her husband not excepted, that she could make if unmarried. *Perkins*

v. *George*, 45 N. H. 453, 454. She had power to lease her real estate to her husband, *Albin* v. *Lord*, 39 N. H. 203; she could loan him money and enforce payment by suit, *Clough* v. *Russell*, 55 N. H. 279, 280. As to her property acquired independently of her husband so far as relates to its control, management and disposition, "a married woman is placed upon an entire equality with her husband or any other person; that is, the disability of coverture is so far wholly removed." *Houston* v. *Clark*, 50 N. H. 479, 482. Up to 1876 the common-law disabilities of coverture were not disturbed by legislation except as to property which a married woman held in her own right. *Dickinson* v. *McLane*, 57 N. H. 31, 32. Chapter 32, Laws 1876, "An act to remove the disabilities of married women" is, "Every married woman may make contracts, and sue and be sued in all matters in law and equity in the same manner as if she was sole and unmarried: provided, however, that all laws now in force as to contracts and conveyances between husband and wife, and as to the rights of the husband in her property or estate, shall not be affected hereby; and provided, also, that no contract or conveyance by a married woman as surety or guarantor for her husband, nor any undertaking by her for him or in his behalf, shall be binding on her." G. L., c. 183, s. 12. As has been said, prior to 1876 a married woman could contract only with reference to her separate property. Contracts not relating to such property were still nullities as at common law. *Penacook Sav. Bank* v. *Sanborn*, 60 N. H. 558. Since 1876 it has not been generally essential to the validity of a married woman's contract that it should be connected with or relate to property held by her in her own right. *Parsons* v. *McLane*, 64 N. H. 478. The statute gave to married women the general power of contract and to that extent justified its title "an act to remove the disabilities of married women." The only limitations upon such right are contained in the two provisos. The first is that the general power of contract given shall not affect "all laws now in force as to contracts and conveyances between husband and wife, and as to the rights of the husband in her property or estate."

At common law husband and wife could not contract at all. Under the laws in force in 1876 they could contract as to her separate property. This proviso did not repeal all the legislation from 1846 to date, but only retained the general prohibition of the common law as to contracts between husband and wife not relating to her estate. Neither did it restore the common-law rights of the husband to the income of the wife's estate. *Burleigh* v. *Coffin*, 22 N. H. 118. The

proviso merely excepted contracts with the husband as to matters not relating to the wife's estate, or which were prohibited on special grounds. *Foote* v. *Nickerson,* 70 N. H. 496. The husband still had his right of curtesy preserved to him by the act of 1846, *c.* 327, *s.* 7, and subsequent legislation, G. S., *c.* 164, *s.* 12, and he remained unempowered by the legislation to convey property directly to his wife. Laws 1846, *c.* 327, *s.* 5; G. S., *c.* 164, *s.* 14; *Chadbourne* v. *Gilman,* 64 N. H. 353. The validity of a contract between husband and wife in relation to her separate estate under this statute is upheld in *People's Trust Co.* v. *Merrill,* 78 N. H. 540. In 1879 a verdict for manslaughter was set aside because the jury were not permitted to find as a fact whether the subject of the crime was occupying his wife's real estate as her tenant or servant, in other words, what was the contract of occupation between husband and wife. *State* v. *Hayes,* 59 N. H. 450. In the same year in *Noyes* v. *Hemphill,* 58 N. H. 536–538, it was said the husband might occupy his wife's real estate under some agreement to pay her rent therefor, or they could "occupy it jointly upon an express or implied agreement, as two men may jointly occupy a farm, or two women jointly occupy a dwelling, or an unmarried man and woman may occupy a store as copartners in trade." See also *Bickford* v. *Dane,* 57 N. H. 320; s. c., 58 N. H. 185; *Cate* v. *Rollins,* 69 N. H. 426; *Evans* v. *Watkins,* 76 N. H. 433. In none of these cases except the first is the proviso of the statute of 1876 mentioned. They evidence, however, a general understanding that the power of a married woman to contract with her husband in relation to her separate estate was not abridged in 1876, a question which was definitely decided in accordance with this understanding when it was directly presented in 1918. *People's Trust Co.* v. *Merrill,* 78 N. H. 540. The second proviso of the statute was construed in a case involving the validity of a loan by a wife to her husband of a note and mortgage owned by her with authority to pledge the same as security for his debt. Of the validity of such a contract by the wife with the husband it is there said: "The statute of 1876 (Laws 1876, *c.* 32; G. L., *c.* 183, *s.* 12) established the binding character of all contracts of a married woman, with the express exception of contracts and conveyances made as surety or guarantor for her husband, and undertakings by her for him or in his behalf. By the language of the exception the legislature could not have intended to include within its operation contracts made directly with, nor conveyances made directly to, the husband by the wife. To be a 'surety or guarantor' for the husband implies a third person, with whom the

contract of suretyship or guaranty for the husband's debt, or to whom the conveyance in pledge or mortgage, must be made; and from the context, 'an undertaking by her for him or in his behalf' must have been intended to mean an 'undertaking' with some one to whom the husband owed a duty. In a certain sense, every contract with or conveyance to the husband by the wife might be said to be 'for him and in his behalf.' But contracts and conveyances between the husband and wife were not affected by the statute of 1876; and the only reasonable construction that can be given to the exception in the statute exonerating a married woman from her contract made in behalf of her husband is one confining it to contracts with third persons to pay or guarantee the payment of her husband's indebtedness to them, and the performance of his contracts with them." *Farnham* v. *Fox,* 62 N. H. 673, 674.

At common law a married woman could charge her separate estate with the payment of her husband's debts. *Babbitt* v. *Morrison,* 58 N. H. 419; *Thompson* v. *Ela,* 58 N. H. 490. The second proviso of the act entitled, an act to remove disabilities, imposed a new incapacity upon married women. *Buss* v. *Woodward,* 60 N. H. 58. Adopted while the litigation in the cases named was pending, it was doubtless inspired by the situation therein revealed. "The purpose of the second proviso of the act of 1876 was to deprive the wife of her common-law capacity to mortgage her estate to secure the payment of her husband's debts . . . and to reënact her common-law incapacity to assume his contract obligations, or to become a surety or guarantor for their performance. . . . The expression 'nor any undertaking by her for him or in his behalf' must be construed with the preceding language by which it is limited and explained. . . . A contract which operates for the husband's advantage is not necessarily an undertaking for him or in his behalf, within the meaning of the statute." *Parsons* v. *McLane,* 64 N. H. 478.

As the act of 1876 did not destroy a married woman's power to contract with her husband for a sale of her estate to him, Mrs. Adams had in 1883, and ever since has had, capacity to make such a contract. Having the same capacity to make such a contract as any landowner, proof of facts which would estop another from denying the fact of such sale would estop her. As she could agree with her husband upon what terms he should occupy real estate to which she had or might make claim, she could assent to his exclusive occupation under a claim of right sufficient to establish a title by prescription. Although Mr. and Mrs. Adams lived together as husband and wife, the findings

are understood to mean that they did not jointly occupy the land in question. As she could sue him for money loaned, she could sue him for excluding her from the occupation of her real estate, or by other assertion of her title, if she claimed any, have prevented the statute from running against her. Upon both grounds upon which the ruling of the court is placed it is sustainable.

But no defect is perceived in the direct deed of Mrs. Adams to her husband. As she could agree directly with her husband to sell her estate to him and sell it to him, she necessarily possessed the power to execute the sale. The unity of person which at common law rendered void all contracts sealed or otherwise between husband and wife in this state no longer exists. Carpenter, J., Hodgman v. Kittredge, 67 N. H. 254, 256. The reason having failed, the rule fails with it. In 1899 the legislature passed an act in terms authorizing any married woman of full age to convey her real estate and providing that "real estate may be conveyed directly by husand to wife, or wife to husband, in all cases where the same thing might lawfully be done through the intervention of a third person." Laws 1899, c. 16. But no statute before this date forbade the wife to convey to the husband. It was the husband only who could not convey. The authority given in terms by this act does not establish that the rule of the common law had not been abrogated by earlier statutory change. In 1842 the legislature provided "any married woman of full age may join with her husband in any conveyance of real estate." R. S., c. 149, s. 10. But lands of a *feme covert* were so conveyed long before. *Gordon v. Haywood*, 2 N. H. 402; *Elliot v. Sleeper*, 2 N. H. 525. Similar legislation removing the disabilities of married women was held in Maine to render valid a deed directly from wife to husband. *Savage v. Savage*, 80 Me. 472; *Allen v. Hooper*, 50 Me. 371. The contrary conclusion in *White v. Wager*, 25 N. Y. 328, has since been corrected by statute. Laws, N. Y., 1887, c. 537. The statute of 1845, c. 327, s. 5; G. L., c. 183, s. 13, provided that it should not be construed as authorizing a husband to convey any of his property to his wife in any other manner than if the law had not been passed, but there is no prohibition upon the right of the wife to convey to the husband. She could not have the same rights to her separate property as if she were unmarried if the fact of marriage circumscribed her right of conveyance. Francis P. obtained title to the land by his wife's deed and, failing that, would hold it as found by the court.

*Case discharged.*

All concurred.